UNITED STATES of America, Appellee,

v.

Miguel A. SERRANO, d/b/a Ponce
Developers, Inc., Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Juan Luis BOSCIO,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

William STAMPS, Defendant, Appellant.

Nos. 85–1912, 85–1913, 88–1268
and 86–1164.

United States Court of Appeals,
First Circuit.

Heard Dec. 5, 1988.

March 1, 1989.

Rehearing and Rehearing En Banc
Denied in Nos. 85–1913 and
88–1268 April 4, 1989.

Carlos V. Garcia Gutierrez, San Juan, P.R., for defendant, appellant Juan Luis Boscio.

Blas C. Herrero, Jr., Hato Rey, P.R., for defendant, appellant Miguel A. Serrano.

Stanley Neustadter with whom Rafael Gonzalez Velez, Santurce, P.R., was on brief for defendant, appellant William Stamps.

Jorge L. Arroyo, Asst. U.S. Atty., Old San Juan, P.R., with whom Daniel F. Lopez–Romo, U.S. Atty., Hato Rey, P.R., Charles E. Fitzwilliam, Acting U.S. Atty., Jose R. Gaztambide, Asst. U.S. Atty., Rio Piedras, P.R., Criminal Div., and Carlos A. Perez, Asst. U.S. Atty., San Juan, P.R., Criminal Div., were on briefs for the United States.

Before CAMPBELL, Chief Judge,
COFFIN and SELYA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

Miguel A. Serrano, Juan Luis Boscio, and William Stamps appeal from their convictions of mail and wire fraud. 18 U.S.C. §§ 1341, 1343 (1982). We affirm the convictions of Serrano and Boscio, but vacate Stamps's conviction and remand his case for a new trial.

## I. BACKGROUND

The defendants' convictions arose out of a series of complex financial transactions involving a number of entities in Puerto Rico. Both Serrano and Stamps worked for Shearson/American Express of Puerto Rico, Inc. ("Shearson"), a subsidiary of Shearson/American Express, Inc. Serrano was a broker and senior vice-president at Shearson; Stamps was Operations Manager at Shearson. Boscio was a local attorney, a member of the Ponce municipal assembly, and president of the board of directors of the Ponce Municipal Development Authority ("Authority"). The Authority was created by the municipality of Ponce to promote and develop new housing for the area. Along with Shearson and the Authority, the following entities were involved in the financial transactions relevant to this case: 1) Citibank; 2) Ponce Developers, Inc. ("PDI"), an entity created and owned by Serrano; and 3) Home Federal Savings and Loan Association of Puerto Rico ("Bank"), the victim of the fraudulent scheme alleged in the indictment.

In the early 1980s, the Bank was in dire financial straits; it had been losing money for several years and needed an infusion of capital to avoid bankruptcy. The Authority also needed funds to finance new housing in Ponce and to subsidize rents. In early 1982, purporting to help the Bank and the Authority raise these needed funds, Serrano arranged a series of Sale, Repurchase and Pledge of Securities Agreements, known as "REPOs" in the financial world. A REPO is essentially a short-term loan agreement whereby the lender loans money to a borrower in return for collateral such as securities owned by the borrower. A REPO may also entail the lender investing the loan proceeds on behalf of the borrower. The lender would then pay the borrower a "spread," which is the difference between the return on the investment and the interest payments the borrower owes the lender for the loan.

In arranging the REPOs in this case, Serrano opened a client account at Shearson for the Authority. As a result, the Authority began receiving monthly client account statements from Shearson. In filling out the form to open the Authority's account, Serrano listed the Bank as the "custodial agent" for assets generated by the Authority's Shearson account, although this was not the case; this automatically triggered the mailing of duplicates of the Authority's client account statements to the Bank. The receipt of these duplicate client statements led the Bank mistakenly to believe that it had an active account at Shearson and that the statements were for its own account. In fact, the Bank was not a Shearson client and did not have an account there. While Serrano did not open an account for the Bank, he opened one for PDI. In opening this account, Serrano did not disclose, as required by Shearson, that he owned PDI.

On May 19–20, 1982, the various entities entered into four related REPOs, each with a five-year term: 1) Citibank loaned Shearson $3 million in return for $3 million in

collateral and a letter of credit; 2) Shearson loaned this $3 million to the Authority in return for $3 million in collateral; 3) the Authority loaned the $3 million to PDI in return for $3 million in collateral; 4) PDI loaned $2 million to the Bank in return for $3 million in collateral. The same collateral was used in all four REPOs—approximately $3 million in "Title 1 notes and FHA mortgages" and conventional mortgages owned by the Bank. Serrano told Bank officials that the $2 million that PDI had loaned the Bank was reinvested in a certificate of deposit ("CD") in a bank in the Bahamas. This CD earned interest at a rate of $11\frac{1}{16}$ percent payable every 90 days; the Bank was to be paid a spread of $1\frac{1}{8}$ percent from the CD.

While on the surface these complex financial transactions at first appeared legitimate to the parties involved, the evidence at trial revealed a fraudulent scheme devised by Serrano and allegedly executed with the help of Boscio and Stamps. In particular, $1 million of the $3 million loan from Shearson to the Authority was transferred to PDI's account at Shearson. Serrano ordered this transfer without the authorization of either the Authority or Shearson. The $1 million was then diverted to Serrano's own personal use. In addition, the Bank was defrauded of $1.7 million worth of mortgages it had pledged in its REPO with PDI; Citibank, the initial source of the $3 million loan and the ultimate recipient of the $3 million in mortgages pledged as collateral, apparently never received $1.7 million of the collateral, nor has it ever been located.

This fraudulent scheme was accomplished by a variety of ruses and misrepresentations: 1) Contrary to Serrano's representations to the Bank, the $2 million CD was not held in its name but in the Authority's name. Thus, the Bank never received the $2 million it was supposed to have received in its REPO with PDI. 2) Serrano, allegedly with the aid of Boscio and Stamps, kept the parties in the dark as to who they actually were dealing with. Shearson did not know that PDI (which was not even incorporated) was a front for Serrano, nor did it know of or authorize a

REPO with PDI or the Bank. The Bank, based on Serrano's representations and having received the duplicate client statements, was led to believe that it was dealing directly with Shearson, that it had an asset-filled account there, and that PDI was merely a Shearson subsidiary. 3) On November 10, 1982, Serrano sent a confirmation letter to Bank auditors that falsely stated that the Bank had an account at Shearson and that a $2 million CD was held in its name. 4) On February 23, 1983, a letter signed by Stamps and prepared by Serrano was sent to the Bank with a copy being sent to the Bank's auditors. This letter also falsely stated that the Bank had an account at Shearson and that the CD was being held in its name.

Partly because of the losses it sustained in the REPO transactions, the Bank collapsed, thus triggering a multitude of audits, investigations (including an investigation by the FBI), and civil suits. These investigations not only revealed the fraudulent scheme that led to the indictments in this case, but also a series of kickbacks and public corruption involving local government officials. Serrano, granted immunity from local prosecution by the Puerto Rico House of Representatives, testified in legislative hearings regarding this public corruption and his financial dealings at Shearson.

These revelations led to three separate indictments. Count One of the indictment returned in this case charged that, by wiring funds in the May 19–20 REPOs, Serrano, Boscio and Stamps, aiding and abetting each other, committed wire fraud in violation of 18 U.S.C. §§ 2, 1341. This count alleged that the three defendants,

> aiding and abetting each other, devised and intented [sic] to devise a scheme and artifice to defraud the Home Federal Savings and Loan Association of Puerto Rico and to obtain Title I notes and FHA mortgages from said Association with a value of approximately $1.7 million dollars and to obtain a million dollars from the proceeds of the Repo # 196 loan by means of false and fraudulent pretenses, representations, and promises ... well

knowing that the pretenses, representations and promises would be and were false when made. . . .

Counts Two, Three and Four each alleged mail fraud in violation of 18 U.S.C. § 1343. Count Two charged Serrano with mailing, for the purpose of executing the scheme to defraud, a knowingly false confirmation letter dated November 10, 1982, to the Bank's auditors regarding the "financial position of the [Bank] as to [its] account with Shearson/American Express. . . ." Count Three charged Serrano and Stamps, aiding and abetting each other for the purpose of executing the scheme to defraud, with mailing the Bank a knowingly false "memorandum dated February 23, 1983 reflecting and representing the financial position of the [Bank] as to [its] account with Shearson American Express. . . ." Count Four charged Serrano and Stamps, aiding and abetting each other for the purpose of executing the scheme to defraud, with mailing two knowingly false "client statement sheets to the name of the [Bank] reflecting the financial position" of the Bank.

The jury convicted all three defendants as charged. Each of the defendants now appeals, advancing arguments as to why his conviction should be overturned. We will discuss each defendant's appeal separately.

## II. WILLIAM STAMPS

Stamps argues on appeal that the evidence was insufficient to sustain his conviction and that he was denied his Sixth Amendment right to confront witnesses when the district court erroneously admitted hearsay into evidence.

### A. *Sufficiency of the Evidence*

Stamps contends that there was insufficient evidence to support his conviction and that the district court erred in denying his motion for acquittal. We have described the appropriate standard for reviewing the sufficiency of the evidence supporting a criminal conviction in *United States v. Torres Lopez*, 851 F.2d 520, 527–28 (1st Cir.1988):

"the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 [99 S.Ct. 2781, 2789, 61 L.Ed.2d 560] (1979); *United States v. Santiago*, 828 F.2d 866, 870 (1st Cir. 1987). In making this determination, we do not assess the credibility of the witnesses, which is the sole function of the trier of fact. *Burks v. United States*, 437 U.S. 1, 16 [98 S.Ct. 2141, 2149, 57 L.Ed.2d 1] (1978); *United States v. Santiago, supra.* Nor does the government have to disprove every reasonable hypothesis of innocence, it is sufficient that the record as a whole supports a conclusion of guilt beyond a reasonable doubt. *United States v. Santiago, supra.*

Stamps was convicted as an aider and abettor[1] of one count of wire fraud[2] and two counts of mail fraud.[3] *See* pages

---

**1.** 18 U.S.C. § 2(a) (1982) states in part: "Whoever commits an offense against the United States or aids, abets ... its commission, is punishable as a principal."

**2.** The federal wire fraud statute provides in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more

than $1000 or imprisoned not more than five years, or both.
18 U.S.C. § 1343.

**3.** The federal mail fraud statute provides in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according

4-5, *supra.* To sustain a mail or wire fraud conviction, the government must prove "the existence of '(1) a scheme conceived ... for the purpose of defrauding ... by means of false pretenses, representations or promises and (2) use of the United States mails [or interstate wire communications] in furtherance of that scheme.' " *United States v. Brien,* 617 F.2d 299, 307 (1st Cir.) (quoting *Gold v. United States,* 350 F.2d 953, 956 (8th Cir.1965)), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed. 2d 273 (1980). *See also Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). The government need not prove that the defendant devised the fraudulent scheme; but it must prove "willful participation in the scheme with knowledge of its fraudulent nature and with intent that these illicit objectives be achieved." *United States v. Price,* 623 F.2d 587, 591 (9th Cir.), *cert denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980). *See also United States v. Lanier,* 838 F.2d 281, 284 (8th Cir.1988) (government need not prove that defendant originally devised scheme; knowing participation sufficient). In order to convict a defendant of aiding and abetting, the government must prove that the defendant in some way associated himself with the fraudulent scheme and that he shared the criminal intent of the principal. *See United States v. Francomano,* 554 F.2d 483, 486 (1st Cir.1977).

Stamps does not dispute that a fraudulent scheme existed and that the mails and interstate wire communications were used in furtherance of this scheme. Rather, he contends that there was insufficient evidence to find beyond a reasonable doubt that he knew of Serrano's misrepresentations or his scheme to defraud. We think there was sufficient competent evidence supporting Stamps's conviction on all three counts.[4]

■ As to Count Three, there was sufficient evidence for a rational jury to find that, for the purpose of executing the fraudulent scheme, Stamps sent the letter of February 23, 1983, falsely confirming that the Bank had an account at Shearson and that the $2 million CD was being held in its name. The letter, sent to the Bank's president, with a copy to the Bank's auditors, was a central component in the effort to conceal the scheme; it lulled the Bank and its auditors into mistakenly believing that the Bank had an active account at Shearson and that the loan proceeds were safely invested in a $2 million CD in the Bank's name, as Serrano had earlier misrepresented. Serrano prepared the letter and gave it to his secretary for Stamps to sign. After Stamps refused to sign the letter at the secretary's behest, Serrano himself went to Stamps's office. After Serrano's ensuing conversation with Stamps, the contents of which are unknown, Stamps signed the letter. The jury could have reasonably inferred that Stamps, who supervised client accounts as the operations manager at Shearson, knew of the fraudulent nature of the letter and signed it intending to further the scheme to defraud.

■ Although a much closer question, there was also sufficient evidence to support the jury's guilty verdict against Stamps under Counts One (the wire fraud involving the May 19-20 REPOs) and Four (the mail fraud involving the mailing of client account statements to the Bank). Stamps managed Shearson's operations department. This department executed the transactions among Shearson and its clients, transferring funds and collateral pursuant to the brokers' instructions. It also kept accounting records in which all transactions at Shearson were supposedly reflected. As manager, Stamps oversaw these activities; he supervised client accounts, the provision of client statements,

---

to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341.

**4.** In so deciding, we exclude all consideration of the erroneously admitted hearsay statement read into evidence at trial from a deposition given by Serrano. *See* pages 7–9, *infra.*

the transfer of funds and collateral, and the payment of checks.

Stamps was also in charge of Shearson's internal control system created to insure compliance with internal and external regulations. Stamps was responsible for notifying the branch manager of any irregularities he uncovered. While many of the documents emanating from the REPO transactions appeared normal on their face, several witnesses described "irregularities" which were crucial to the success of the fraudulent scheme: 1) Shearson's records contained no document authorizing the transfer of $1 million from the Authority's account to PDI's account; Shearson's normal procedures required a letter from the transferor authorizing such a transfer. 2) Shearson's former branch manager testified that it was very irregular for the Bank to receive duplicates of the Authority's client statements. 3) When PDI opened its account, Shearson required PDI at some point to submit articles of certification of incorporation to the broker who would then deliver them to Stamps. This certification apparently never was submitted. Indeed, it was later discovered that PDI was never incorporated. 4) The REPO deals had a term of five years. Most REPOs have at most a one-year term.

Stamps contends that he should not be found guilty solely because of the occurrence of these irregularities, his supervisory responsibilities, and his ready access to the relevant Shearson records. There was additional circumstantial evidence, however, supporting the jury's verdict. Shearson's branch manager, who signed many of Shearson's checks, had asked Stamps and the operations department to provide him with a weekly list of all checks to enable him to properly supervise the check-writing process and to detect any irregularities in payments made from Shearson accounts. Except for submitting such a list for one week, Stamps spurned this request and instructed operations personnel not to comply with the request. In addition, while various other Shearson employees signed them, Stamps countersigned many of the checks written against PDI's Shearson account which Serrano later obtained and deposited for his own personal gain. Finally, it is Stamps who signed the materially false confirmation letter of February 23, 1983. The letter contained representations which a person in Stamps's position could and would routinely have checked out against the Bank's records before lending his personal confirmation, making it implausible that Stamps did not know they were false. Given Stamps's supervisory responsibilities, the other irregularities that took place, Stamps's refusal to submit the weekly checklists, and his signing of the PDI checks, a reasonable jury could infer that Stamps knowingly aided and abetted Serrano in the wire fraud described in Count One and the mailing of the fraudulent client statements in Count Four.

### B. Admission of Hearsay Statements

In the fall of 1983, after irregularities surfaced concerning the REPOs, Shearson initiated an internal investigation. In October 1983, the Shearson investigators deposed Serrano. During this deposition, Serrano stated that Stamps was aware of and made the $1 million transfer to PDI. It was this $1 million transfer which eventually was diverted to Serrano's own personal use and which was at the heart of the fraudulent scheme alleged in the indictment. At trial, one of the Shearson investigators read into evidence parts of this deposition, including Serrano's statement concerning Stamps. This statement strongly indicated Stamps's knowledge of, and complicity in, the fraudulent scheme. Stamps argues that this statement was inadmissible hearsay and deprived him of his Sixth Amendment right to confront witnesses as Serrano did not testify at trial. The government contends that the statement was admissible under Fed.R.Evid. 801(d)(2)(E) as a coconspirator statement.[5]

---

**5.** There are procedural issues, cutting in opposite directions, which relate to our ability to consider this question: while counsel for Stamps eventually lodged an objection to this hearsay statement, he inexplicably failed to object when the deposition was first admitted into evidence, and he waited for several minutes after the incriminating portion had been read

If the statement is admissible as a coconspirator statement under Rule 801(d)(2)(E), there is no violation of the confrontation clause. *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987). Rule 801(d)(2)(E) provides:

A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

But an out-of-court statement of an alleged coconspirator will be admissible under the rule only if the district court determines by a preponderance of the evidence that the statement was made " '(1) during the course and (2) in furtherance (3) of a conspiracy (4) of which declarant is a member.' " *Earle v. Benoit*, 850 F.2d 836, 841 (1st Cir.1988) (quoting J. Weinstein & M. Berger, 1 *Weinstein's Evidence* ¶ 104[05], at 104–39 (1986)). *See also United States v. Carroll*, 860 F.2d 500, 506 (1st Cir.1988).

The present statement was inadmissible hearsay as to Stamps because it was neither made in the course or in furtherance of the alleged conspiracy. It should have been stricken as evidence against Stamps. *Cf. United States v. Palow*, 777 F.2d 52, 57 (1st Cir.1985) (post-arrest statements not made in furtherance of conspiracy), *cert. denied*, 475 U.S. 1052, 106 S.Ct. 1277, 89 L.Ed.2d 585 (1986). The statement was made during a deposition arranged by upper-echelon Shearson officers and attorneys to investigate irregularities concerning the REPOs. The deposition took place on October 21, 1983. By that time, the objectives of the alleged conspiracy had long since "either failed or been achieved." Advisory Committee Notes on Rule 801(d)(2)(E). The last substantive act alleged against defendants in the indictment took place on February 23, 1983. Various audits of the Bank had taken place, the last one completed on September 30, 1983. The Bank had instructed Serrano to cancel its REPO deal in September 1983, and Serrano himself apparently submitted his letter of resignation to Shearson in the summer of 1983. Finally, Shearson initiated its internal investigation around September of 1983. In short, whatever the fraudulent scheme achieved in 1982 and early 1983, it is evident that it had collapsed by the time of Serrano's statement at the deposition in October 1983, and thus it was not made in the course or furtherance of any alleged conspiracy.

While conceding that the overt acts of the scheme had long since passed, the government contended at oral argument that the statement was made to conceal the scheme and thus to assure its success by avoiding detection, and consequently is admissible under Rule 801(d)(2)(E). But when asked at oral argument what was left to conceal by the time the statement was made, the government could point to nothing. The Supreme Court has rejected an interpretation of the coconspirator statement exception to the hearsay rule that would go as far as the government here urges. In *Krulewitch v. United States*, 336 U.S. 440, 443–44, 69 S.Ct. 716, 718–19, 93 L.Ed. 790 (1949), the Court stated:

the [government's] argument is that even after the central criminal objectives of a conspiracy have succeeded or failed, an implicit subsidiary phase of the conspiracy always survives, the phase which has concealment as its sole objective.... We cannot accept the Government's contention.... The rule contended for by the Government could have far-reaching results. For under this rule plausible

---

into the record before objecting and moving for a mistrial. Given the fact that the deposition was available and its contents presumably well known to counsel in advance of its admission, there can be little reason for such tardiness. *See Saville v. United States*, 400 F.2d 397, 400 (1st Cir.1968), *cert. denied*, 395 U.S. 980, 89 S.Ct. 2137, 23 L.Ed.2d 768 (1969); Fed.R.Evid. 103(a)(1). *See generally* J. Weinstein and M. Berger, 1 *Weinstein's Evidence* ¶ 103[02], at 103–20–22 (1986). On the other hand, the government did not argue or otherwise point out defense counsel's tardiness in its appellate brief, thus waiving the issue. *See Grubba v. Bay State Abrasives*, 803 F.2d 746, 747 (1st Cir.1986); Fed. R.App.P. 28(a)(4). We conclude that the government's failure to raise the point coupled with the fact that, while counsel was late, he did eventually object, make it appropriate for us to disregard defense counsel's otherwise very serious default in objecting.

arguments could generally be made in conspiracy cases that most out-of-court statements offered in evidence tended to shield co-conspirators. We are not persuaded to adopt the Government's implicit conspiracy theory which in all criminal conspiracy cases would create automatically a further breach of the general rule against the admission of hearsay evidence.

This does not mean that acts of concealment can never have significance where they are "done in furtherance of the main criminal objectives of the conspiracy." *Grunewald v. United States*, 353 U.S. 391, 405, 77 S.Ct. 963, 974, 1 L.Ed.2d 931 (1957). *See also United States v. Medina*, 761 F.2d 12, 18 (1st Cir.1985) (conspiracy continued so long as coconspirators were acting together to destroy incriminatory evidence); *United States v. Davis*, 623 F.2d 188, 192 (1st Cir.1980) (acts of concealment made in furtherance of main criminal objectives of the conspiracy and were thus admissible). But when the acts of concealment are done after the central objectives have been attained, for the purpose only of covering up after the crime, they are inadmissible. *See Grunewald*, 353 U.S. at 405, 77 S.Ct. at 974. As this is the case here, the statement was inadmissible hearsay and should not have been considered as evidence against Stamps.[6]

We also find that the admission of this statement was not harmless error.[7] At trial, Stamps defended on the ground that he was completely unaware of Serrano's fraudulent scheme. Although the admissible evidence against him would support a finding of guilt, *see* pages 5–7 *supra*, the case against Stamps was far from overwhelming, and the jury would have been fully justified in concluding that

Stamps simply was one of those duped by Serrano. The hearsay statement, clearly showing Stamps's complicity in the crucial $1 million transfer to PDI, strongly bolstered the government's case. Indeed, the government emphasized the statement in its closing arguments to the jury. *Cf. United States v. DeVaugn*, 579 F.2d 225, 228 (2d Cir.1978) (no harmless error where, among other things, government's closing argument focused on erroneously admitted hearsay). Because "[w]e cannot say that the erroneous admission of the hearsay declaration may not have been the weight that tipped the scales against" Stamps, *Krulewitch*, 336 U.S. at 445, 69 S.Ct. at 719, we reverse his conviction and remand his case to the district court for a new trial.[8]

## III. JUAN LUIS BOSCIO

Boscio was convicted as an aider and abettor of the wire fraud alleged in Count One of the indictment. *See* pages 4–5 *supra*. On appeal he argues there was insufficient evidence to sustain his conviction. He also purports to appeal from the denial of several post-conviction motions he made subsequent to the filing of his initial notice of appeal.

### A. *Sufficiency of the Evidence*

Boscio moved for a judgment of acquittal under Fed.R.Crim.P. 29 at the close of the government's case and after the jury returned its guilty verdict. The district court denied both motions. We affirm the district court's rulings because we find, viewing the record as a whole and in the light most favorable to the government, that there was sufficient evidence supporting Boscio's conviction as an aider and abettor.

6. Because we have found that the statement was not admissible under Rule 801(d)(2)(E), we need not decide whether the confrontation clause barred its admission as well. While the Supreme Court in *Bourjaily*, 107 S.Ct. at 2782, held that statements admissible under the rule present no confrontation clause problem, the converse may not necessarily be true. *See Dutton v. Evans*, 400 U.S. 74, 82, 91 S.Ct. 210, 216, 27 L.Ed.2d 213 (1970) ("[M]erely because evidence is admitted in violation of a long-estab-

lished hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied.").

7. The government has not even argued that, if error, the statement was harmless.

8. Because we find that Stamps is entitled to a new trial on these grounds, we need not address Stamps's argument that the district court erred in denying his motion for a separate trial.

While Serrano may have been the mastermind of the fraudulent scheme, a rational juror could have inferred that Boscio knew of and facilitated the scheme given his connection with each of the various entities involved in the REPOs and the intermediary role he played between the entities. Boscio was a well-connected local attorney: 1) He was president of the Authority's board of directors. 2) Kathy Procopio, a savings and loan examiner for the Federal Home Loan Bank Board who investigated the Bank's involvement in the REPOs in August 1982, testified that Serrano told her during her investigation that Boscio was a member of the Ponce municipal assembly.[9] 3) Procopio also testified that, based on her investigation, she had learned that Boscio was an attorney for PDI.[10] 4) One of Boscio's relatives was on the Bank's board of directors. 5) Boscio knew Serrano and had done business with him in the past as a representative of the Authority.

Taking advantage of these connections, Boscio helped initiate and arrange the REPO deals that provided the basis for the fraudulent scheme. He played a key role in the Authority's involvement in the REPO. The Authority had a client account at Shearson and had been doing business there for some time. When Shearson's lawyers questioned the Authority's power to engage in such business with Shearson, as opposed to Shearson dealing directly with the municipal government of Ponce, Boscio strongly disagreed and told Shearson that the Authority did have such power. It was around this time that Boscio suggested that the Authority retain Serrano to help it obtain the financing that led to the REPOs. Boscio introduced the Author-

ity's executive director, Augusto Zayas, to Serrano. Although Zayas signed the REPOs on behalf of the Authority, it was Boscio who authorized and, in fact, instructed him to do so. Before signing the REPO with PDI, Zayas questioned Serrano as to why PDI was involved in the deal; at the time, Zayas did not know what PDI was. Serrano, angered by the question, insisted that if the deal with PDI was not signed, the Authority would not be able to obtain the $3 million in financing. Afraid that the deal would fall through and because "there was no objection on the part of the president [Boscio]" who was present, Zayas signed the REPO deal. Shearson sent at least one of the Authority's client account statements emanating from this REPO to Boscio. As it turned out, the Authority never did receive the $3 million in financing.

Boscio also played a role in the Bank's involvement with the REPOs. The president of the Bank first contacted Serrano regarding the Bank's dire financial situation at the behest of a relative of Boscio who was a member of the Bank's board of directors. In addition, several months after the Bank entered into the REPO in May 1982, Boscio contacted Angelo Vigna, an official at the Federal Home Loan Bank of New York which regulates thrift institutions, regarding the Bank's financial situation. Boscio told Vigna that he represented the mayor of Ponce and asked Vigna to consider a plan that would recapitalize the Bank. Several weeks later, Boscio, Serrano, and officials from the Bank met with Vigna in New York where this proposed plan as well as the REPOs were discussed.

---

9. Boscio appears to claim on appeal that this statement was not a coconspirator's statement under Fed.R.Evid. 801(d)(2)(E) and thus was inadmissible hearsay. But Boscio never at any time objected to the admission of this testimony at trial and thus we are foreclosed from considering this issue on appeal, see Fed.R.Evid. 103(a)(1), nor do we find that the admission of this testimony was plain error. See Fed.R.Evid. 103(d). See United States v. Griffin, 818 F.2d 97, 99–100 (1st Cir.), cert. denied, — U.S. ——, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987); United States v. Krynicki, 689 F.2d 289 (1st Cir.1982).

10. At trial, Boscio objected to this testimony on grounds of hearsay; the district court overruled the objection. In his statement of facts in his brief on appeal, Boscio again insists that this was hearsay. However, he does not specifically challenge the district court's ruling in the argument section of his brief. See Grubba v. Bay State Abrasives, 803 F.2d 746, 747 (1st Cir.1986); Fed.R.App.P. 28(a)(4). Even if we were to review this evidentiary ruling, the testimony appears to have been based on the witness's personal knowledge; the district court did not, therefore, err in its ruling.

This evidence depicts Boscio as a common denominator among the different entities entwined in the fraudulent transactions concocted by Serrano. Indeed, Kathy Procopio, the savings and loan examiner who investigated the Bank's involvement in the REPOs in August 1982, testified that Serrano had told her at the time of her investigation that Boscio was "the key individual in the local transaction and in getting this [REPO] money to [the Bank]." [11] The success of the fraudulent scheme turned partly on keeping the various parties in the dark as to who they were in reality dealing with. Shearson thought it was dealing only with the Authority; it apparently was Shearson's policy not to conduct REPO business with entities on shaky financial footing such as the Bank. The Bank, on the other hand, was led to believe that it was dealing directly with Shearson. In the middle of these complicated transactions was the shadowy PDI, for which Boscio acted as an attorney, and the Authority, which never actually received the $3 million in financing and whose president was Boscio. Unlike those kept in the dark, Boscio had his foot in all the elements of the transactions that led to the fraudulent diversion of $1 million to PDI and Serrano and to the theft of the Bank's collateral. Given this, and taking the evidence as a whole, a rational juror could have inferred beyond a reasonable doubt that Boscio knew of Serrano's fraudulent scheme and aided and abetted Serrano in the wire fraud charged in Count One of the indictment. Thus, there was sufficient evidence to sustain Boscio's conviction.

## B. *Post–Conviction Motions*

A year after Boscio was convicted, he moved under Fed.R.Crim.P. 33 for a new trial based on the ground of newly discovered evidence. Boscio also moved at this time to dismiss the indictment because of certain alleged prosecutorial improprieties in the grand jury proceedings. The district court denied these motions in a written order dated November 12, 1987, and filed with the clerk's office on November 13, 1987; the docket entries prepared by the clerk of the district court indicate that this order was also entered on the docket on November 13 and that the parties were notified of the ruling on November 17. On November 24, 1987, Boscio filed a notice of appeal from the order. This appeal was consolidated with his appeal from his conviction. However, at least as the record currently stands, his notice of appeal from the order denying his post-conviction motions was untimely: it was filed 11 days after the order appears to have been entered on the criminal docket. Fed.R.App.P. 4(b) requires that "the notice of appeal by a defendant shall be filed in the district court within *ten* days after the entry of the judgment or order appealed from.... A judgment or order is entered within the meaning of this subdivision when it is entered in the criminal docket." (Emphasis added.) Thus, Boscio's notice of appeal had to be filed by Monday, November 23, ten days after the order appears to have been entered on the docket on November 13.

Boscio claims, however, that the order was actually entered on November *20* and thus his notice of appeal was timely. In the district court, he filed a motion under Fed.R.Crim.P. 36 to correct the docket so that it would indicate November 20 as the entry date for the order. In support of this motion, Boscio's attorney submitted a sworn statement indicating the following: 1) On November 20, in an effort to have the district court's order entered on the docket, Boscio's attorney communicated with the district court clerk's office and was told that the order had not been entered on the docket. 2) After communicating with the district judge's chambers the same day, he was told that the order had been entered on the docket that afternoon. Thus, according to Boscio, November 13, the date appearing on the docket, is merely the date the order was *filed* with the clerk's office; the clerk's office mistakenly never added the

---

**11.** Boscio appears to argue that this statement did not satisfy the requirements under Fed.R. Evid. 801(d)(2)(E) and was inadmissible hearsay. Because Boscio failed to object to the admission of this statement at trial, we will not consider its admissibility on appeal; its admission did not constitute plain error. *See* page 10 n. 9, *supra.*

notation "EOD 11–20–87," indicating the date the order was actually *entered*.[12] The district court denied the Rule 36 motion to correct this alleged mistake without explanation.

Boscio appeals from this ruling, asking this court to reverse the district court's denial of his Rule 36 motion.[13] We decline to do so. When a dispute concerning "whether the record truly discloses what occurred in the district court," Fed.R. App.P. 10(e), has been submitted to the district court, the court's determination is conclusive "absent a showing of intentional falsification or plain unreasonableness." *United States v. Mori*, 444 F.2d 240, 246 (5th Cir.), *cert. denied*, 404 U.S. 913, 92 S.Ct. 238, 30 L.Ed.2d 187 (1971). *See* J. Moore & B. Ward, 9 *Moore's Federal Practice* ¶ 210.08[1], at 10–48 (1988). There has been no such showing here. Thus, we affirm the district court's denial of Boscio's motion to correct the record. We, therefore, lack jurisdiction over Boscio's appeal from the denial of his post-conviction motions, as the record indicates that Boscio's notice of appeal was untimely.

Even, however, if we had jurisdiction over this appeal, we would not upset the denial of Boscio's post-conviction motions. The district court acted within its discretion in denying Boscio's motion for a new trial based on newly discovered evidence. *See United States v. Angiulo*, 847 F.2d 956, 983–84 (1st Cir.) (applying abuse of discretion standard), *cert. denied*, — U.S. —, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988). There was simply nothing new about the "newly discovered" evidence—that the Bank never endorsed the mortgage notes used as collateral in the REPOs and thus, according to Boscio, the Bank could not have been defrauded of the notes. This matter was raised at trial when the Bank's president testified that the notes were not endorsed by the Bank when they were transferred during the REPOs "because the Bank had to keep ... title to the notes." Boscio's attorney chose not to cross-examine this witness. It also appears that Boscio was provided copies of the notes before trial. Because the evidence was not "in fact newly discovered," Boscio was not entitled to a new trial. *United States v. Rodriguez*, 738 F.2d 13, 17 (1st Cir.1984).

There is also no merit to Boscio's claim that the district court erred in denying his motion to dismiss the indictment because of alleged "irregularities which occurred during the presentation of this case to the grand jury." One such "irregularity" was the presence at one point of three Assistant United States Attorneys ("AUSA") in the grand jury room; according to Boscio, this created an "overbearing and undue influence on the grand jurors." Fed.R.Crim.P. 6(d) expressly states, however, that "[a]ttorneys for the government ... may be present while the grand jury is in session." (Emphasis added.) Moreover, all three AUSAs had a legitimate reason for being there: one was presenting the evidence to the grand jury; one, a newcomer to the United States Attorney's office, was simply observing a grand jury proceeding for the first time; and the third apparently introduced the newcomer to the grand jurors and then awaited his turn to present a different matter to the grand jury. The third AUSA had previously worked for the municipality of Ponce. Boscio argues that this created a conflict of interest. We reject this argument because the district court found that this AUSA did not participate or assist in the grand jury investigation that led to the indictments in this case. There is nothing in the record to contradict this finding. The remaining alleged "irregularities" do not warrant dis-

---

**12.** An "EOD" entry, meaning "Entered on Docket," is customary when the date of filing noted in the margin does not coincide with the date the order is actually entered.

**13.** Boscio also requests that we "treat the joint motion made by the parties herein as a stipulation" and to order the correction under Fed.R. App.P. 10(e). Although the government apparently did not oppose the Rule 36 motion below, the government, while not disputing Boscio's version of events, has carefully refrained from taking any position in this appeal concerning this issue. The government has plainly not entered into any sort of stipulation that would provide a basis for an order under Rule 10(e).

cussion. "The sanction ... of dismissing an indictment after a defendant has been convicted of an offense is employed in only truly extreme cases of egregious prosecutorial misconduct." *Porcaro v. United States*, 784 F.2d 38, 44 (1st Cir.), *cert. denied*, 479 U.S. 916, 107 S.Ct. 320, 93 L.Ed. 2d 293 (1986). Because this is not such a case, we would conclude, assuming we had jurisdiction over this appeal, that the district court did not err in denying Boscio's motion to dismiss the indictment.

## IV. MIGUEL A. SERRANO

■ Serrano appeals from the district court's denial of his pretrial motion to dismiss the indictment. He argues, as he did in his pretrial motion, that the government used his immunized testimony before a subcommittee of the Puerto Rico House of Representatives to obtain the indictment in this case. We affirm.

Serrano's financial dealings at Shearson and his involvement with various officials of the municipality of Ponce, popularly known in Puerto Rico as the "Shearson scandal," spawned two federal grand jury investigations which led to three separate indictments against Serrano. The first grand jury, empaneled on October 19, 1983, and discharged on April 10, 1985, returned the indictment against Serrano, Stamps, and Boscio in the present case, CR 85–0024(GG), on February 1, 1985, and also returned the indictment in CR 84–0381(JP) against Serrano alone on November 28, 1984. The indictment pertaining to CR 84–0381(JP) charged Serrano with wire fraud, 18 U.S.C. § 1343, misapplication of bank funds, 18 U.S.C. § 656 (1982), and making false entries in documents of federal credit institutions. 18 U.S.C. § 1006 (1982). A different grand jury, empaneled on December 3, 1984, and discharged in November 1986, returned the indictment in CR 85–0449(CC) on October 31, 1985, against Serrano, Boscio, and Jose Tormos Vega, the former mayor of Ponce. Count One of this indictment charged Serrano with conspiring with Boscio and Tormos to obstruct commerce by extortion in violation of 18 U.S.C. § 1951 (1982).

The "Shearson scandal" also led to an investigation by the Puerto Rico legislature into allegations of public corruption. In order to obtain his testimony in subcommittee hearings regarding these allegations, the Commonwealth's House of Representatives granted Serrano "absolute immunity" from local prosecution. As a consequence, prior to the return of the three federal indictments, Serrano testified before the committee on September 25, 27, and 28, 1984. His testimony received wide publicity and was fully televised.

Watching Serrano's immunized testimony on television was Harry Garcia. Garcia was the FBI agent responsible for the federal investigations of Serrano and the "Shearson scandal"; he testified before both grand juries that returned the three indictments against Serrano. Garcia had the testimony videotaped and also subsequently obtained a complete transcript of Serrano's testimony. He sent a copy of this transcript to Lydia Lizarribar, the Assistant United States Attorney in charge of the investigation and prosecution in this case (CR 85–0024(GG)).[14] As previously mentioned, Serrano was indicted in this case on February 1, 1985.

Before trial, Serrano moved to dismiss the indictment on the ground that his Fifth Amendment privilege against self-incrimination had been violated when, according to Serrano, "agents and officers of the United States ... obtained, directly and indirectly and as a result of [his] immunized testimony, evidence which resulted in the indictment by the grand jury." *See Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *Murphy v. Waterfront Commission of New York Harbor*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).[15] After an evidentiary

---

14. The government went so far as to include a transcript of Serrano's immunized testimony in its trial exhibit list in this case. The transcript was struck from the exhibit list by the district court.

15. Serrano made similar arguments in CR 84–0381(JP) and CR 85–0449(CC). In CR 84–0381(JP), Serrano pled guilty to three counts of the indictment. After being sentenced, he moved to withdraw his plea and also moved to

hearing in which agent Garcia testified and after reviewing the grand jury transcripts in camera, the district court denied this motion, finding that the indictment was "not based on evidence included in the compelled testimony of ... Serrano or its fruits." After being convicted and sentenced, Serrano filed a timely notice of appeal. While this appeal was pending, Serrano moved in the district court, among other things, to dismiss the indictment on the ground that he had obtained newly discovered evidence that the government had improperly used his immunized testimony in obtaining the indictment and prosecuting this case. After reviewing the grand jury transcripts as well as the government's investigative file in the case which contained approximately 1,000 documents, and based on the evidence adduced at trial, the district court denied Serrano's motion. *United States v. Serrano*, 680 F.Supp. 58 (D.P.R.1988). Serrano has chosen not to appeal from the denial of his postconviction motion. This appeal is consequently limited to a review of the denial of his pretrial motion and the issues raised in that motion. We will, however, refer to the district court's findings of fact contained in its post-conviction ruling insofar as they relate to the pretrial motion. *See Gibbs v. Buck*, 307 U.S. 66, 78, 59 S.Ct. 725, 732, 83 L.Ed. 1111 (1939) (considering lower court's findings of fact even though they were filed after appeal was taken).

In *Murphy*, 378 U.S. at 77–78, 84 S.Ct. at 1609, the Supreme Court held that "the constitutional privilege against self-incrimination protects a state witness against incrimination under federal as well as state law...." The protection afforded a witness who testifies under a state grant of immunity is limited, however, to barring the *use* of the immunized testimony in the federal prosecution; it does not serve to bar the federal prosecution altogether:

[W]e hold the constitutional rule to be that a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him. We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and federal Governments in investigating and prosecuting crime, the Federal Government must be prohibited from making any such use of compelled testimony and its fruits. This exclusionary rule, while permitting the States to secure information necessary for effective law enforcement, leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity.

*Id.* at 79, 84 S.Ct. at 1609–10 (footnote omitted). Thus, the Fifth Amendment prohibits "the use of [immunized] testimony, as well as evidence derived directly and indirectly therefrom." *Kastigar*, 406 U.S. at 453, 92 S.Ct. at 1661.

"Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence." This burden of proof ... is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

dismiss the indictment on the grounds that the government had used his immunized testimony to obtain the indictment. The district court denied this motion, and Serrano has filed a separate appeal (Nos. 85–1815 and 85–1934) from this ruling. In CR 85–0449(CC), which stemmed from a separate grand jury investigation, the district court dismissed the indictment

against Serrano, finding that the evidence presented to the grand jury in that case was obtained directly or indirectly from his immunized testimony. *United States v. Tormos–Vega*, 656 F.Supp. 1525 (D.P.R.1987). The government did not appeal from this order of dismissal.

*Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1665 (quoting *Murphy,* 378 U.S. at 79 n. 18, 84 S.Ct. at 1609 n. 18). *Kastigar* characterized this burden as a "heavy" one. *Id.* at 461, 92 S.Ct. at 1665. The district court's determination as to whether the government has carried this burden is binding unless clearly erroneous. *United States v. Romano,* 583 F.2d 1, 7 (1st Cir.1978).

The government does not dispute that Serrano testified under immunity at the legislative hearings "to matters related to the federal prosecution." *Murphy,* 378 U.S. at 79 n. 18, 84 S.Ct. at 1609 n. 18. It was thus incumbent upon the government to show that it "had an independent, legitimate source for the disputed evidence." *Id.* The district court found that the government had met this burden. In its ruling denying Serrano's post-conviction motion, the district court described its findings regarding Serrano's pretrial motion as follows:

> At [the pretrial evidentiary] hearing, agent Garcia testified that the case was complete before Serrano testified before the legislature, and that the evidence presented to the grand jury was his own testimony concerning the contents of reports of witness interviews by the FBI during investigation conducted prior to September 1984. He testified that he did not present any evidence to the grand jury derived from his reading of Serrano's immunized testimony. No improperly derived information—i.e., no communication or link between his testimony and the present criminal case suggestive of taint—was brought to the attention of the court during the hearing. The grand jury minutes related to this proceeding were provided to the court for an *in camera* inspection. After carefully examining them, and considering the evidence presented and arguments adduced at the hearing, the court denied the dismissal finding that the indictment returned by the grand jury was not based on evidence derived from Serrano's immunized testimony or from its fruits.

*Serrano,* 680 F.Supp. at 62.

Based on our review of the record, we cannot say that the district court's subse-quent findings were clearly erroneous. The federal investigation that led to the indictment in this case began in November 1983, nearly a year before Serrano gave his immunized testimony in September 1984. From February to May 1984, the grand jury subpoenaed numerous documents, and agent Garcia interviewed numerous witnesses, including officials of Shearson, the Bank, the Bank's auditors, the Authority, and Serrano himself. During this same period, Garcia had been in contact with an official of the local Treasury Department, which had initiated an investigation into Serrano's dealings before the federal investigation had begun. Garcia obtained documentary evidence from this official, including PDI's ledgers. Garcia had also obtained three depositions given by Serrano— one given to Shearson investigators in October 1983, one given to Treasury investigators in March 1984, and one given to SEC investigators in May 1984. According to Garcia, 90 percent of his investigation in this case had been completed by the time Serrano gave his immunized testimony. The remaining ten percent consisted of interviewing several witnesses and retrieving documents he had already reviewed and requested before Serrano testified in the legislative hearings. Garcia testified in the pretrial evidentiary hearing that Serrano's immunized testimony did not provide any additional evidence or trigger any additional investigation in this case.

 Garcia testified before the grand jury that indicted Serrano in this case. Indeed, he appears to have been the government's key witness, explaining the REPO deals and summarizing the evidence he had gathered regarding Serrano's fraudulent scheme. At the evidentiary hearing, Garcia stated that, at least in regard to the indictment returned in this case, he did not "use or present[ ] any documents, evidence, information that [he] had not known prior to the September 1984 Legislative hearings" in his testimony before the grand jury. At the end of one grand jury session, Garcia did mention that Serrano had testified under immunity in the legislative hearings and told the grand jury that Serrano

had revealed at the hearings that he, Tormos and Boscio had met in Florida and discussed disguising alleged kickbacks as loans. This reference did not concern the indictment in this case, but rather the indictment in CR–85–0449(CC). The district court, in its post-conviction ruling, found this reference to be "harmless, beyond a reasonable doubt, in light of the more than adequate untainted testimonial as well as documentary evidence adduced to support the indictment and subsequent conviction." *Serrano,* 680 F.Supp. at 65 (citing *United States v. Rogers,* 722 F.2d 557, 560 (9th Cir.1983), *cert. denied,* 469 U.S. 835, 105 S.Ct. 129, 83 L.Ed.2d 70 (1984), and *United States v. Shelton,* 669 F.2d 446, 464 (7th Cir.), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982)). *See also United States v. Byrd,* 765 F.2d 1524, 1529 n. 8 (11th Cir.1985) (use of immunized testimony does not result in dismissal of indictment if found to be harmless beyond a reasonable doubt); *United States v. Gregory,* 730 F.2d 692, 698 (11th Cir.1984) (same), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985); *United States v. Beery,* 678 F.2d 856, 860 n. 3, 863 (10th Cir.1982) (same). While the reference to Serrano's immunized testimony was clearly improper, we do not think the district court's finding of harmless error was clearly erroneous given the substantial untainted evidence presented to the grand jury and the tangential nature of the reference in relation to the indictment returned in this case. We consequently affirm the district court's finding that the government made no evidentiary use, either direct or indirect, and that the indictment was based on evidence derived from a legitimate source wholly independent of the immunized testimony.

 Serrano argues that, apart from alleged evidentiary use of his immunized testimony, the government used it improperly for "nonevidentiary purposes." One court has described such nonevidentiary use as "conceivably includ[ing] assistance in focusing the investigation, deciding to

initiate prosecution, refusing to plea bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy." *United States v. McDaniel,* 482 F.2d 305, 311 (8th Cir.1973). To what extent the Fifth Amendment's privilege against self-incrimination bars the nonevidentiary use of immunized testimony is a difficult question. Neither *Murphy* nor *Kastigar* addressed this question, and lower courts have disagreed on the issue. *Compare United States v. Semkiw,* 712 F.2d 891 (3d Cir.1983); *McDaniel,* 482 F.2d 305; *United States v. Carpenter,* 611 F.Supp. 768 (N.D.Ga.1985); *United States v. Smith,* 580 F.Supp. 1418 (D.N.J.1984) (all requiring government to show no nonevidentiary use of immunized testimony) *with United States v. Mariani,* 851 F.2d 595 (2d Cir.1988); *United States v. Crowson,* 828 F.2d 1427 (9th Cir.1987), *cert. denied,* —— U.S. ——, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988); *United States v. Byrd,* 765 F.2d 1524 (11th Cir.1985) (all rejecting claim that nonevidentiary use warranted dismissal of indictment). The commentators are also divided over this issue. *Compare* Humble, *Nonevidentiary Use of Compelled Testimony: Beyond the Fifth Amendment,* 66 Tex.L.Rev. 351 (1987) (arguing that Fifth Amendment prohibits only evidentiary uses of immunized testimony) *with* Strachan, *Self–Incrimination, Immunity, and Watergate,* 56 Tex.L.Rev. 791 (1978) (discussing dangers of nonevidentiary use of immunized testimony and arguing for transactional immunity to avoid these dangers). We have uncovered no First Circuit case discussing the issue.

While Serrano advances on appeal his argument that the government made nonevidentiary use of his immunized testimony, he did not raise it in his pretrial motion to dismiss the indictment.[16] Instead, his pretrial motion was limited to his assertion that the government had "obtained, directly and indirectly and as a result of the immunized testimony, *evidence* which resulted in the indictment by the grand jury." (Emphasis added.) Our review of the record indicates that Serrano never raised

---

**16.** Serrano did raise this issue in his post-conviction motion to dismiss the indictment. However, Serrano did not appeal from the denial of this post-conviction motion.

the issue of whether the government made nonevidentiary use of his testimony. "The ordinary rule is that appellate courts will not consider issues not raised below." *United States v. Krynicki,* 689 F.2d 289, 291 (1st Cir.1982). *See also Johnston v. Holiday Inns, Inc.,* 595 F.2d 890, 893–94 (1st Cir.1979). In "exceptional cases or particular circumstances," however, appellate courts have discretion "to review questions of law neither pressed nor decided below." *Krynicki,* 689 F.2d at 291. Such an exceptional case will arise when 1) the new issue is purely legal, and the record pertinent to resolution of this issue can be developed no further; 2) the new ground is so compelling as virtually to insure appellant's success; 3) the new issue is almost certain to arise in other cases; and 4) declining to address the issue will result in a gross miscarriage of justice. *Id.* at 291–92; *Johnston,* 595 F.2d at 894.

Applying these factors here, we decline to consider whether the government made nonevidentiary use of Serrano's immunized testimony, and if so, whether this warrants the dismissal of the indictment. The record on appeal is clearly inadequate to resolve this highly factual issue. In determining whether the government made evidentiary use of the testimony in deciding Serrano's pretrial motion, the district court considered the testimony of agent Garcia and the grand jury transcripts. The nonevidentiary use of the testimony not being in issue, the government did not present to the district court evidence to disprove nonevidentiary use such as: 1) its investigative file; [17] 2) the transcript of Serrano's immunized testimony; 3) testimony by the prosecutors involved in the case. The record consequently contains none of these items, nor do we have the benefit of district court findings relevant to this fact-intensive issue.

Furthermore, the issue Serrano has raised for the first time on appeal is not "so compelling as virtually to insure [his] success." *Johnston,* 595 F.2d at 894. We disagree with the Eighth Circuit's statement in *McDaniel,* 482 F.2d at 311, that, where the prosecutor has been exposed to the immunized testimony, "the government is confronted with an insurmountable task in discharging the heavy burden" of proving no nonevidentiary use. Such an approach amounts to a per se rule that would in effect grant a defendant *transactional* immunity once it is shown that government attorneys or investigators involved in the prosecution were exposed to the immunized testimony. *Kastigar* made clear that "[t]ransactional immunity ... affords the witness considerably broader protection than does the Fifth Amendment privilege." 406 U.S. at 453, 92 S.Ct. at 1661. Instead, the purpose of the Fifth Amendment bar against the use of immunized testimony is to " 'leave[ ] the witness and the Federal Government in *substantially* the same position as if the witness had claimed his privilege' in the absence of the grant of immunity," *id.* at 458–59, 92 S.Ct. at 1664 (quoting *Murphy,* 378 U.S. at 79, 84 S.Ct. at 1609) (emphasis added), not in the *identical* position or in a position as if the witness had remained silent. *See United States v. Apfelbaum,* 445 U.S. 115, 127, 100 S.Ct. 948, 955, 63 L.Ed.2d 250 (1980) ("For a grant of immunity to provide protection 'coextensive' with that of the Fifth Amendment, it need not treat the witness as if he had remained silent.").

As do most courts, we do not think this purpose is automatically frustrated by the government's mere exposure to immunized testimony. *See Crowson,* 828 F.2d at 1430; *United States v. Pantone,* 634 F.2d 716, 720 (3d Cir.1980). We also reject the notion that all nonevidentiary use necessarily violates the Fifth Amendment. While we need not decide whether certain nonevidentiary uses of immunized testimony may so prejudice the defendant as to warrant dismissal of the indictment, we agree with the Second Circuit that a prosecution is not foreclosed merely because the "immunized testimony might have tangentially influenced the prosecutor's thought processes in

---

17. The government submitted this file for the district court's examination as part of its opposition to Serrano's post-conviction motion in which Serrano did raise the issue of nonevidentiary use.

preparing the indictment and preparing for trial." [18] *Mariani*, 851 F.2d at 600. *See also Byrd*, 765 F.2d at 1530–32. Our position is buttressed by the analogy *Kastigar* drew between the prohibition against the use of immunized testimony and cases involving coerced confessions. 406 U.S. at 461, 92 S.Ct. at 1665. While not mentioned in the *Kastigar* opinion, no case involving a coerced confession has prohibited the non-evidentiary use of an involuntary statement. *See* Humble, *Nonevidentiary Use of Compelled Testimony: Beyond the Fifth Amendment*, 66 Tex.L.Rev. at 375 n. 154. *Cf. Williams v. Florida*, 399 U.S. 78, 83, 90 S.Ct. 1893, 1896, 26 L.Ed.2d 446 (1970) (holding that a statute requiring defendant to provide the government with advance notice of alibi defense does not violate the privilege against self-incrimination).

Because we reject the notion that the mere exposure to immunized testimony or the mere possibility of nonevidentiary use automatically results in the dismissal of the indictment, Serrano's claim of nonevidentiary use is not so compelling as to warrant our consideration of this newly raised issue in the context of the circumstances of his case.[19] That this issue may arise in a future case is no reason to address it here. Nor do we think our refusal to address it will result in a "gross miscarriage of justice." *Johnston*, 595 F.2d at 894. We consequently affirm the district court's denial of Serrano's pretrial motion to dismiss the indictment.

## V. CONCLUSION

To summarize: 1) While there was sufficient evidence to support his conviction, we vacate Stamps's conviction and remand his case to the district court for a new trial because the jury may have been swayed by incriminatory hearsay statements erroneously admitted into evidence. 2) We affirm the denial of Boscio's motion for acquittal as there was sufficient evidence supporting his conviction. We also affirm the denial of Boscio's motion to correct the record; as a consequence, we dismiss for lack of jurisdiction his appeal from the denial of his post-conviction motions for a new trial and to dismiss the indictment. 3) Finally, we affirm the denial of Serrano's pretrial motion to dismiss the indictment.

*So ordered.*

---

**18.** We in no way mean to condone the government's actions in this case. The government attorneys and investigator involved in this case were apparently ignorant of Department of Justice internal policy which has led to the establishment of guidelines that are to be followed in prosecuting a case involving a defendant, or potential defendant, who has testified under a grant of immunity. *See* United States Attorney's Manual of March 23, 1984, tit. 1, ch. 11.330. Adherence to these guidelines, by assuring that those investigating and prosecuting the case have no access to the immunized testimony, will facilitate the government's already heavy burden in establishing an independent source for its evidence.

**19.** We note, however, that Serrano was already a target of the grand jury investigation, and the decision to seek an indictment against him appears to have preceded his immunized testimony. In addition, his testimony apparently was not directly related to the indictment returned in this case; agent Garcia testified that he viewed Serrano's televised testimony in preparing for CR 85–0449(CC).