UNITED STATES, Appellee,

v.

Fabio RODRIGUEZ CORTES,
Defendant, Appellant.

UNITED STATES, Appellee,

v.

Eduardo OCAMPO–HOYOS,
Defendant, Appellant.

UNITED STATES, Appellee,

v.

Rafael PEREZ MARTINEZ,
Defendant, Appellant.

Nos. 90–1921, 91–1055, 90–1977 and 90–1978.

United States Court of Appeals,
First Circuit.

Heard Aug. 1, 1991.
Decided Nov. 21, 1991.

534

Scott T. Kalisch, with whom Kalisch & Lyons, Coral Gables, Fla., was on brief, for appellant Edwardo Ocampo–Hoyos.

Stephen A. LaClair, with whom Alvin E. Entin and Entin, Schwartz, Goldman, Margules & Moore, Miami, Fla., were on brief, for appellant Rafael Perez Martinez.

Jose R. Aguayo, Hato Rey, P.R., for appellant Fabio Rodriguez Cortes.

Edwin O. Vazquez, Asst. U.S. Atty., with whom Daniel F. Lopez–Romo, U.S. Atty., Hato Rey, P.R., was on brief, for appellee.

Before SELYA, Circuit Judge,
BOWNES, Senior Circuit Judge, and
WOLF,[*] District Judge.

BOWNES, Senior Circuit Judge.

Fabio Rodriguez Cortes, Robinson Rodriguez Cortes, Eduardo Ocampo-Hoyos, Maritza Candelaria Pantoja and Rafael Perez Martinez were arrested in November of 1989 during a federal Drug Enforcement Administration (DEA) investigation of a Colombian cocaine operation. The five defendants were tried jointly for conspiracy to import cocaine into the United States and other related offenses.[1] Robinson Rodriguez Cortes was acquitted of the charges against him. His brother, Fabio Rodriguez Cortes, along with Eduardo Ocampo Hoyos and Rafael Perez Martinez, appeal their convictions. Each challenges the sufficiency of the evidence underlying his conviction and raises other claims on appeal. Maritza Candelaria Pantoja is not involved in these appeals.

### THE EVIDENCE

The evidence consists mainly of recorded telephone conversations between undercover DEA agents and members of the cocaine conspiracy.

In August of 1989, DEA Task Force Agent Jose Morales, working undercover as "Jose," negotiated with two brothers, Eliezer and Libardo Sierra, and Jose Eduardo Lozada, also known as "Junior," leaders of a Colombian drug organization, to import large quantities of cocaine from Colombia to Puerto Rico. After an initial round of phone conversations, the Sierra brothers agreed to send twenty-six kilograms of cocaine to Agent Morales. The plan was that a suitcase with the cocaine, code-named "Carmen," would be sent aboard LACSA Airlines Flight 653 on October 22 to Luis Munoz Marin International Airport in Puerto Rico. The price for the cocaine was set at $312,000. Agent Morales also agreed to pay the Sierras an extra $20,000 to settle a debt owed by a certain Frank de Armas. Agent Morales agreed to make two cash payments to the representatives of the Sierras. They would come to Puerto Rico from Miami and would identify themselves as employees of the Sierras by giving the correct passwords to Morales.

On October 22, 1989, government agents in Puerto Rico seized the suitcase when it came off the designated flight. It held twenty-six kilograms of cocaine as per the agreement. It had been agreed beforehand that payment for the shipment would be made in two installments. The Sierra brothers, of course, did not know that the suitcase had been confiscated. On October 27, Libardo Sierra told Agent Morales that his representatives would arrive the next day and collect the first installment of $168,000. They would identify themselves with the passwords, "Libardo, Jose Eduardo, venimos por la encomienda que trajo Carmen." Roughly translated into English this means: "Libardo, Jose Eduardo, we

---

[*] Of the District of Massachusetts, sitting by designation.

1. Count One charged all defendants with conspiracy to import cocaine into the customs territory of the United States in violation of 21 U.S.C. §§ 952(a) and 963. Defendants Fabio Rodriguez Cortes and Robinson Rodriguez Cortes were charged in Count Three of the indictment with aiding and abetting each other in the use of a communication facility in committing and facilitating the crime of conspiracy to import cocaine into the customs territory of the United States in violation of Title 21 U.S.C. § 843(b). Defendant Eduardo Ocampo Hoyos was charged in Count Six of the indictment with using a communication facility in committing and facilitating the crime of conspiracy to import cocaine into the customs territory of the United States in violation of 21 U.S.C. § 843(b).

come to get the errand of Carmen." Other agents would arrive the following Tuesday or Wednesday to collect the balance due, using the passwords, "Libardo, encomienda de Carmen." The English translation is "Libardo, the errand for Carmen." [2] On October 31, Agent Morales told Eliezer Sierra that no one had come for the money.

On November 4, Agent Morales spoke with Eliezer Sierra and Junior and was told that their collectors would be in Puerto Rico that afternoon. No one arrived, however, to collect the payment as scheduled. Two days later Agent Morales received a call from a woman who identified herself as "Maritza." Maritza told Agent Morales that she was at the Dutch Inn and would be leaving that afternoon. Another undercover agent, Agent Jorge Lampon, posing as "Lito," received calls from a woman, identifying herself as "Mari," and a man. Mari told Agent Lampon that she had "come for Carmen's errand." [3]

That same day Agent Morales spoke with an individual who called himself "Willy" and agreed to meet him at a local Burger King restaurant. Willy arrived at the Burger King parking lot, and Agent Morales questioned him about the purpose of their meeting. Willy said that he had come on behalf of Libardo for Carmen's package and the documents for Carmen. When Agent Morales asked him about a suitcase and money, Willy suggested that they call Colombia to find out what was going on. Agent Morales assumed that Willy did not know about the drug transaction and let him go without arresting him.

Also that day Agent Morales received several telephone calls telling him to call "Pecos" at 721–0810, room 303. Agent Morales did so and spoke with a person whose voice he later identified as that of Robinson Rodriguez Cortes. When Agent Morales asked "Who is this?" Robinson replied, "It's from Carmen and Libardo." Agent Morales then asked Robinson if he had a code, and Robinson replied, "No, that's it," and then, "Only that, Libardo and Carmen."

At 3:40 p.m., after the encounter with Willy, Agent Morales and Agent Andres Amador, also working undercover, met Robinson Rodriguez Cortes and appellant Fabio Rodriguez Cortes at the Dutch Inn Hotel. The two brothers entered Agent Morales' car, introduced themselves as "Robin" and "Pecos," and explained that they had been sent from Miami by a woman to collect $163,000 on behalf of Libardo and Carmen. Convinced that the two were part of the conspiracy, Agent Morales arrested them.

Agents Morales and Amador then returned to the Dutch Inn where Morales had scheduled a meeting with Maritza Candelaria Pantoja and appellant Rafael Perez Martinez. Both Candelaria and Perez Martinez came over to the agents' car and got in. Agent Morales asked who had sent them. Candelaria said they were sent by "Amparo" in Miami, and Perez Martinez added, "For the errand from.... For Carmen." Agent Amador said, "Wait let me tell you, this a very serious matter and we want to be on the clear, you know the problems this could bring." Perez Martinez replied, "160,000 bucks." After an exchange in which Agent Morales emphasized his concern that there could be a mix-up in the deal and asked if Libardo was the person with whom they had dealt, Perez Martinez answered, "Yes. Correct." Candelaria added, "Wait I have it here written down in the notebook." At one

---

**2.** Throughout the remainder of this opinion, we shall use the court reporter's English translations of transcripts and testimony. All of the dialogue which we shall quote, including the courtroom testimony of Agent Morales and the defendants and the conversations which were tape recorded by the government, has been translated from Spanish into English.

**3.** The government and defendant Maritza Candelaria Pantoja stipulated that had Agent

Lampon been called to the stand, he would have testified that he received a telephone call on November 6 from a woman who identified herself as Mari, and that Mari stated at the beginning of the conversation, "I come for Carmen's errand." The parties stipulated that this statement was not recorded because Agent Lampon did not turn on the tape recorder on time; only a later part of the conversation was recorded.

point, Candelaria talked about "Jose Lizardo," and Morales corrected her, "Libardo."

Convinced that Candelaria and Perez Martinez were involved in the conspiracy, Agent Morales drove to a bridge where they were arrested by police who had been stationed there. Candelaria's purse contained a black telephone book in which Agent Morales' telephone number and the words "Jose," "Lisandro," and "on behalf of Carmen" were written.

The next day a woman who called herself "Soledad" called from Miami to tell Agent Morales to expect a Puerto Rican woman named Maritza and her husband to collect $160,000. Soledad explained that Maritza would use the password, "Lisandro on behalf of Carmen." When Agent Morales told Soledad that the password was "Libardo," not "Lisandro," Soledad said that Maritza and her husband had the wrong password.

On the morning of November 8, Libardo Sierra called Agent Morales to tell him that two men would collect the entire payment. Sierra asked what had gone wrong with Willy. He then told Agent Morales not to ask any questions this time and that once he heard the password he should hand over the money without further discussion. Later that morning Libardo Sierra called Agent Morales again and said that his friend, "Ed, from Eduardo in English" had called him from Puerto Rico and had agreed to pick up all the money. Roughly two hours later, Ed and Agent Morales spoke. Ed said he was calling to receive the errand for Carmen. Agent Morales later identified Ed's voice as that of Eduardo Ocampo Hoyos. Agent Morales arranged for a meeting that day. A short time later he arrived at the designated address. The address he gave Ocampo Hoyos for the meeting was the building that housed the central office of the DEA. Ocampo Hoyos did not realize the significance of the address. Agent Morales asked him, "Well, and what's up, every-

thing fine?" and Ocampo answered, "Everything [is] fine, I'm here to see Jose from Libardo and Jose Eduardo for the errand [of] Carmen." As soon as Ocampo gave the passwords, he was arrested.

More evidentiary details will be supplied during our discussion of the individual appeals.

### Fabio Rodriguez Cortes

Fabio Rodriguez Cortes, a/k/a Pecos, raises only one issue on appeal: the sufficiency of the evidence.[4] The jury found him guilty of Counts One and Three of the indictment: conspiracy to import cocaine into the customs territory of the United States in violation of 21 U.S.C. sections 952(a) and 963, and aiding and abetting in the use of a communication facility to commit a felony in violation of 21 U.S.C. section 843(b) and 18 U.S.C. section 2.

To determine whether the district court properly denied the defendant's motion for acquittal, we review the evidence in the light most favorable to the government, including all reasonable inferences to be drawn helpful to the government's position. *United States v. Valencia–Lucena*, 925 F.2d 506, 512 (1st Cir.1991) (citations omitted). We will uphold a jury verdict if "*any* reasonable juror 'after viewing the evidence in the light most favorable to the prosecution ... could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Walters*, 904 F.2d 765, 770 (1st Cir.1990) (emphasis in original) (citations omitted). We may not, of course, assess the credibility of the witnesses. *United States v. Serrano*, 870 F.2d 1, 5 (1st Cir.1989) (citations omitted). The government need not disprove every reasonable hypothesis of innocence if the record as a whole supports a verdict of guilt beyond a reasonable doubt. *Id.* "'[T]he trier of fact is free to choose among various reasonable constructions of the evidence....'" *United States v. Hil-*

---

4. We note that two docket numbers, 90–1921 and 91–1055, have been assigned to Rodriguez' appeal. The defendant's first appeal, 90–1921, claimed that an error had been made at sentencing and that his conviction was not supported by the evidence. After his motion for reconsideration of sentence was granted, and his original sentence reduced, Rodriguez filed a new notice of appeal which was docketed 91–1055. Appeal 90–1921 is moot.

*ton,* 894 F.2d 485, 488 (1st Cir.1990) (citations omitted).

To prove Rodriguez's participation in the conspiracy, the government had to show the existence of a conspiracy and the defendant's knowing and voluntary participation in it. *United States v. Benavente Gomez,* 921 F.2d 378, 380 (1st Cir. 1990). "In order to prove that a defendant belonged to and participated in a conspiracy, the government must prove two kinds of intent; intent to agree and intent to commit the substantive offense." *United States v. Rivera–Santiago,* 872 F.2d 1073, 1079 (1st Cir.), *cert. denied sub nom. Castro–Poupart v. United States,* 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989), *and Romero–Lopez v. United States,* 493 U.S. 832, 110 S.Ct. 105, 107 L.Ed.2d 68 (1989). The agreement may be tacit or express and may be proven by circumstantial as well as express evidence, *id.* Furthermore, the government need not prove that the defendants knew all of the details of the conspiracy or its members. "All that is required is to show 'the essential nature of the plan and [the defendants'] connection with it.'" *Id.* (quoting *Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947)).

Fabio claims that the government failed to prove beyond a reasonable doubt that he had knowledge of the conspiracy or intended to participate in it. The government's evidence against Fabio included the testimony of Agent Jose Morales, tape recordings of various conversations, and physical evidence seized from the defendant after his arrest. Agent Morales testified that at about 2:30 p.m. on November 6, 1989, he received two calls in a row. In both, he was told to call "Pecos" at 721–0810 in room 303. Agent Morales made the call; Robinson Rodriguez Cortes, the brother of Fabio Rodriguez Cortes, a/k/a Pecos, picked up the phone. When Agent Morales asked, "Who is this?" Robinson replied, "[i]t's from Carmen and Libardo." When Agent Morales asked if he had a code, an unidentified male then said "No, that's it." Robinson told Agent Morales

that he and another person were at the "casino," or Dutch Inn Hotel, and would meet him there at 3:30 that afternoon. At 3:40 p.m., Agent Morales, accompanied by Agent Amador, arrived in front of the Dutch Inn Hotel. There, they called to Robinson and Fabio Rodriguez, who got into their car. Robinson introduced himself as "Robin"; Fabio introduced himself as "Pecos."

Agent Morales testified that, "As soon as they got in, we started talking about the deal, about the money, about the twenty-six kilos, about the suitcase, about the deal that had just taken place, the fact that the money was going to be delivered." The transcript of the recorded conversation, however, does not reveal any specific mention of drugs, the twenty-six kilos of cocaine, or suitcases. Robinson explained that a "lady" had sent them from Libardo and Carmen. Robinson then said, "One hundred sixty-three thousand [on one] side for Libardo and all that crap." Robinson also indicated that he knew that Agent Morales had been traveling in Europe, information which Agent Morales had given only to the Sierra brothers. After Agent Morales said that he had the money in $100 and $50 denominations, Fabio told him to buy money orders. The brothers were then arrested.

After the arrests, the agents seized from Fabio a piece of white paper on which was written telephone, beeper and account numbers, an address, and two names, including "Jose." Jose was Agent Morales' undercover name. The telephone number was the one given by Agent Morales to the Sierra brothers to be used by their payment collectors. Also seized from Fabio were two personal checks for $4,000 each. A check for $9,500 signed by Carmen de Alvarado,[5] undated and not made out to anyone, was seized from Robinson Rodriguez Cortes. Passports and round-trip air tickets from Barranquilla, Colombia to Miami were also seized from the brothers.

Despite Fabio Rodriguez's explanations for the events leading up to his arrest, we

---

5. Carmen de Alvarado has not been identified.

find that the government's evidence was sufficient to prove beyond a reasonable doubt that the defendant participated in the conspiracy to import cocaine. Fabio Rodriguez Cortes and his brother gave a good approximation of the passwords. They knew exactly how much money they were supposed to collect. It was Fabio who suggested that Agent Morales convert the large bills into money orders. The checks, one of which was signed "Carmen de Alvarado," indicated that the brothers Rodriguez were being paid handsomely for their efforts. We uphold the conviction against Fabio Rodriguez Cortes on count I.

■ Fabio also challenges the sufficiency of the evidence underlying his conviction on Count III. Count III of the indictment charged both brothers with:

> aiding and abetting each other, knowingly, intentionally and unlawfully [using] a communication facility, that is, the telephone, in committing and facilitating the commission of the crime of conspiracy to import into the customs territory of the United States from a place outside thereof, to wit, the Republic of Colombia, cocaine, a Schedule II Narcotic Drug Controlled Substance. All in violation of Title 21, United States Code, Section 843(b) [6] and Title 18 United States Code, Section 2.[7]

It is established in this circuit that:

> a culpable aider and abetter need not perform the substantive offense, be present when it is performed, or be aware of the details of its execution. Instead, to establish aiding and abetting liability, the government must prove that the defendant associated himself with

the venture, participated in it as in something he wished to bring about, and sought by his actions to make it succeed.

*United States v. Garcia–Rosa*, 876 F.2d 209, 217 (1st Cir.1989) (citations omitted), *cert. denied*, 493 U.S. 1030, 110 S.Ct. 742, 107 L.Ed.2d 760 (1990), *and vacated on other grounds sub nom. Rivera–Feliciano v. United States*, —— U.S. ——, 111 S.Ct. 377, 112 L.Ed.2d 391 (1990).

■ The government's evidence on Count III is the following. On November 6, 1989, Agent Morales received messages from an unknown source to call Pecos at a number which turned out to be the Dutch Inn Hotel. Agent Morales made the call and spoke with Robinson Rodriguez Cortes. Agent Morales did not speak with Fabio Rodriguez Cortes over the telephone.[8] Seized from the defendant at the time of arrest was a piece of white paper with Agent Morales' beeper number and telephone number written on it.

Because Fabio Rodriguez Cortes was convicted of conspiracy to import cocaine, he is responsible for the acts his co-conspirators committed to further the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946). There can be no doubt that the telephone call between Agent Morales and Robinson Rodriguez Cortes furthered the conspiracy in which Fabio Rodriguez Cortes participated. The conviction of Fabio Rodriguez Cortes on count three as an aider and abetter in using the telephone to facilitate and commit a conspiracy to import cocaine into the United States is affirmed.

---

**6.** 21 U.S.C. § 843(b) (1988) states:

> It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter. Each separate use of a communication facility shall be a separate offense under this subsection. For purposes of this subsection, the term "communication facility" means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds

and includes mail, telephone, wire, radio, and all other means of communication.

**7.** 18 U.S.C. § 2 states: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal."

**8.** The transcript of the November 6 tape-recorded conversation between Agent Morales and Robinson Rodriguez Cortes lists Pecos as the person with whom Agent Morales spoke. At trial, however, Agent Morales acknowledged that it was not with Fabio, a/k/a Pecos, but Robinson with whom he spoke.

### Eduardo Ocampo Hoyos

Eduardo Ocampo Hoyos was found guilty on Counts One and Six of the indictment: conspiracy to import cocaine into the customs territory of the United States in violation of 21 U.S.C. sections 952(a) and 963; and using a communication facility to commit a felony (importing cocaine into the customs territory of the United States) in violation of 21 U.S.C. section 843(b).

Ocampo Hoyos raises four issues on appeal: (1) the admission into evidence of an unauthenticated Colombian identification card; (2) prosecutorial misconduct; (3) sufficiency of the evidence as to both counts; and (4) the propriety of a "willful blindness" jury instruction.

The facts leading to Ocampo Hoyos' arrest and conviction can be summarized briefly. Agent Morales testified that on November 8, 1989, Libardo Sierra called him to say that he had received a call from his "friend Ed," in Puerto Rico. Libardo instructed Agent Morales to make both payments to Ed. A few hours later, Eduardo Ocampo Hoyos called Agent Morales to arrange a meeting to collect the money. Ocampo arrived as scheduled at the meeting place, the building housing the DEA headquarters, said the password given to Agent Morales by Libardo Sierra, and was arrested as he entered the elevator. Found on Ocampo's person after his arrest was a piece of paper with the password, Agent Morales' beeper number, the address of the DEA headquarters, and the name "Lito," the undercover name of another agent involved in the investigation. A Colombian identification card was also seized from Ocampo Hoyos.

We begin our discussion with Ocampo Hoyos' claim that an unauthenticated Colombian identification card was improperly admitted into evidence. Defendant moved *in limine* to exclude the admission of the Colombian identification card. The card had a picture of the defendant on it and stated that Edward Ocampo Hoyos was born on either January 11 or November 1, 1967, in Cali, Colombia. After examining the card and listening to evidence on its admissibility, the court ruled that it would be admitted in evidence, stating:

THE COURT: And the judge after hearing the arguments of counsel will, if the Government identifies it and moves it into evidence after I see the foundation, I will admit it into evidence. I'm making now a—I'm weighing the factors mentioned by both counsel under Rule 403 and I think that the relative [probative] value outweighs it's [sic] prejudicial effect.

First of all, it tends to demonstrate that a Colombian would be more willing to trust another Colombian than anybody else, if the argument of the Government is validated by the jury verdict, that he came here to collect 168,000 dollars, not only what was owed for that shipment but also the 20,000 dollars included that is owed directly to Libardo and Eliezer Sierra; and secondly, it also has the name Edward and according to the tape we just heard, Mr. Libardo Sierra identified him as Edward, not as "Eduardo," and that would tend to prove that the name that is being used in all these conversations and by the one that he, Libardo, knows him is what it says in that card.

So, if the Government moves that into evidence later on, that would be my ruling under Rule 403.

The card was subsequently moved in evidence and admitted as exhibit 53. Humberto Deliz, a friend of Ocampo Hoyos, testified that Ocampo Hoyos was born in Colombia but spent most of his life in the United States; that he was nineteen years old; and he used the card, which showed him to be twenty-three years of age, to purchase alcoholic beverages in Miami, where the drinking age is twenty-one. This evidence was not contradicted in whole or in part.

 Federal Rule of Evidence 403 requires the trial court to balance the relevance of evidence against the substantial risk of prejudice to the defendant.[9] Such

---

**9.** Fed.R.Evid. 403 states in pertinent part: "Although relevant, evidence may be excluded if its

admissions of evidence are within the sound discretion of the trial court. *United States v. McMahon,* 938 F.2d 1501, 1507 (1st Cir.1991). We will not disturb such rulings absent an abuse of discretion. *Knowlton v. Deseret Medical, Inc.,* 930 F.2d 116, 124, (1st Cir.1991); *Pittsley v. Warish,* 927 F.2d 3, 9 (1st Cir.1991); *United States v. Green,* 887 F.2d 25, 27 (1st Cir.1989); *United States v. Foley,* 871 F.2d 235, 238 (1st Cir.1989). We will, nevertheless, reverse a lower court's determination in "exceptional circumstances." *Green,* 887 F.2d at 27 (citations omitted). We find that such exceptional circumstances exist in this case.

■ We find that the district court abused its discretion in admitting the identification card. The trial court's finding of relevance relied on two distinct propositions. The court's first assumption was that the card made it more likely that Ocampo Hoyos was the "Ed" referred to in one of the tape-recorded telephone conversations as the person who would pick up the drug payments. Second, the court found that a Colombian is more likely to trust another Colombian. Since the card identified Ocampo Hoyos as a "Colombian," the court reasoned, it was therefore more likely that Ocampo Hoyos would be entrusted with the collection of a large sum of money.

The trial court mistakenly believed that the person referred to in the tape recording between Morales and Libardo Sierra was "Edward." In actuality, Sierra referred to an "Ed" not an "Edward." Ocampo's given name "Eduardo" would be as consistent with the nickname "Ed" as would the name "Edward" found on the identification card. The card did not make it more probable that Ocampo Hoyos was the "Ed" referred to by Sierra.

Further, even if Sierra did refer to an "Edward" in the conversation with Morales, there is no evidence that the name Edward was either unusual or unique in Puerto Rico or Colombia. It is a common name in the United States. That the defendant was carrying an identification card with the name Edward did not make it more likely that he was the person referred to as "Ed" by Libardo Sierra.

We are more disturbed by the assumption underlying the court's second asserted ground for relevance. In admitting the evidence, the trial court relied on generalizations about natives of Colombia. The district court stated, outside the presence of the jury, that the card "tends to demonstrate that a Colombian would be more willing to trust another Colombian than anybody else...." The trial court assumed that since the other members of the conspiracy were Colombians, it was more likely than not that the defendant, as a Colombian, would know about the conspiracy and be entrusted as a courier.

Whether or not intended, the effect of the introduction of the identification card into evidence was to allow the jury to determine guilt based on Ocampo Hoyos' supposed nationality. The prosecutor said as much in his closing argument:

> You also have a Colombian I.D., the Government's exhibit 53, there it [sic] states the place and the date where this young man was born and it states "Cali" and that is a Colombian I.D. card, Cali is one of the cities of Colombia. This man, this young man has ties with Colombia, from there you can reasonably infer why Libardo Sierra was calling him his friend.

In context, this could be taken as an appeal to the jurors to find the defendant guilty by reason of his national origin, inviting them to believe that if a person is born in Colombia, then he must be involved in drug trafficking. This form of reasoning is precisely the type of prejudice that Federal Rule of Evidence 403 is intended to guard against. The authors of the Federal Rule of Evidence warned against evidence that induces a "decision on a purely emotional basis ..."; and which creates an "undue tendency to suggest a decision on an improper basis." Fed.R.Evid. 403 advisory committee's note.

In *United States v. Doe,* 903 F.2d 16 (D.C.Cir.1990), the D.C. Circuit Court of

probative value is substantially outweighed by the danger of unfair prejudice...."

Appeals held that the district court erred in admitting expert testimony concerning the method of operation of Jamaican drug dealers and the role Jamaicans played in the drug trade in the District of Columbia. *Id.* at 23. The court noted that the prosecutor frequently referred to the defendants as "Jamaicans," and in summation stressed the expert evidence of Jamaican control over drug trafficking. *Id.* at 18. Though the evidence was arguably probative, the court observed that " 'discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice.' " *Id.* at 21 (quoting *Rose v. Mitchell,* 443 U.S. 545, 555, 99 S.Ct. 2993, 3000, 61 L.Ed.2d 739 (1979)). The court noted that evidence that appeals to the jury's racial or ethnic bias may impermissibly sway a jury's verdict. *Id.* at 21. It concluded by holding that evidence that improperly plays upon such bias has no place in a criminal trial. *Id.* at 22.

We find the observations and holding of the D.C. Circuit particularly pertinent to the facts of this case. In admitting the identification card, the trial judge failed to take into account the inherently prejudicial nature of the evidence. A card identifying the defendant as a native Colombian could have been and was, in fact, used as the basis for making generalizations about all Colombians. The admission of the card as an exhibit made it more likely that whatever preconceived notions the jury might have had about Colombians and drug trafficking would infect the deliberative process. Under Federal Rule of Evidence 403, evidence that is probative but is "substantially outweighed by the danger of unfair prejudice" may be excluded. Because the threshold for relevance is quite low, the identification card did meet the Federal Rule of Evidence 401 requirement. *See United States v. Tierney,* 760 F.2d 382, 387 (1st Cir.), *cert. denied,* 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). Contrary to the district court, however, we find that the card's potential for prejudice far outweighed any probative value it might have had. The district court abused its discretion in admitting the identification card. *See United States v. Hastings,* 847 F.2d 920, 924 (1st Cir.), *cert. denied,* 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988) (a trial judge abuses his discretion when, in making the determination at issue, he relies on an improper factor); *see also Independent Oil & Chem. Workers v. Proctor & Gamble Mfg. Co.,* 864 F.2d 927, 929 (1st Cir.1988) (same).

■ One final comment on this part of this issue. Defendant claims that the prosecutor's argument constituted misconduct. We do not think so. The card was admitted into evidence and the prosecutor used it in argument in the only way he could; he exploited its potential for prejudice. This is not a case of a prosecutor distorting an exhibit out of context. The prosecutor's comments followed the signal the district court gave when it ruled the card admissible. Although the prosecutor's comments were improper, given the context in which the card was admitted, they did not rise to the level of misconduct.

Though the trial court abused its discretion, the issue still remains whether the admission of the card was reversible error. The government never addressed the question of whether the court's admission of the card, if error, would be harmless. In keeping with this circuit's well-settled rule that issues not raised on appeal are waived, *see United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990); *Brown v. Trustees of Boston Univ.,* 891 F.2d 337, 352 (1st Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1989), it is likely that the government in this case has waived the harmless error argument.

It is a case of first impression for this circuit whether, or when, a court should engage in a harmless error analysis *sua sponte* notwithstanding the government's procedural default. The Seventh Circuit has ruled that the government waives a harmless error analysis if not raised on appeal. *United States v. Giovannetti,* 928 F.2d 225, 227 (7th Cir.1991); *see also United States v. Pryce,* 938 F.2d 1343, 1348 (D.C.Cir.1991) (D.C. Circuit agreeing with general approach though not explicitly finding government waived analysis).

The rule in the Seventh Circuit is that the court of appeals may, *sua sponte*, enter into a harmless error inquiry only after an examination of three factors: "[1] the length and complexity of the record, [2] whether the harmlessness of the error or errors found is certain or debatable, and [3] whether a reversal will result in protracted, costly and ultimately futile proceedings in the district court." *Giovannetti*, 928 F.2d at 227; *see also Pryce*, 938 F.2d at 1348 (adopts general approach but not specific factors).

There is much to be said for this approach. In a case of clearly harmless error it would be a waste of judicial resources to require a new trial where the result is likely to be the same. In a complex case, it would be equally wasteful of judicial resources to require the appellate bench to delve independently into a complex record without the aid of the government's brief and the defendant's responses to it. *See Pryce*, 938 F.2d at 1348; *see also Giovannetti*, 928 F.2d at 227.

■ We need not formulate a definite rule today. In this instance, the harmfulness of the error is obvious. Raising the harmless error analysis *sua sponte* we find that the admission of the identification card was blatantly prejudicial and for that reason reversible error. For non-constitutional evidentiary errors under Federal Rule of Evidence 403 this court will find "[a]n error is 'harmless if we determine that it is highly probable that the error did not contribute to the verdict.'" *Benavente Gomez*, 921 F.2d at 386 (citing *United States v. Gonzalez–Sanchez*, 825 F.2d 572, 580 (1st Cir.1987)).

Here it is far too likely that the error affected Ocampo Hoyos' substantial rights. It was a very close case; it would have taken very little to tilt the balance. By basing admissibility on an egregiously wrong reason, the court colored the subsequent proceedings. Whether or not the prosecuting attorney followed the court's lead, everything that both attorneys did from the moment the judge ruled was necessarily colored by their knowledge of the judge's improper reason. Moreover, the government's failure to brief and argue harmless error is, itself, an indication that it recognized how harmful the evidence was.

Because we find reversible error in the admission of the identification card we must, therefore, order a new trial. Thus, it is unnecessary to review Ocampo Hoyos' other claims on appeal.

## Rafael Perez Martinez

The jury found Rafael Perez Martinez guilty on Count One of the indictment, conspiracy to import cocaine into the customs territory of the United States in violation of 21 U.S.C. sections 952(a) and 963. Perez Martinez raises four issues on appeal: (1) sufficiency of the evidence; (2) the propriety of a denial of a continuance; (3) exclusion from evidence of two documents under Federal Rule of Criminal Procedure 16(d)(2); and (4) the trial court's classification of the defendant for sentencing purposes as a "minor" as opposed to "minimal" participant under U.S.S.G. § 3B1.2.

### A. *Sufficiency of the Evidence*

We examine the evidence and the facts in the light most favorable to the government, drawing all reasonable inferences supporting the government's position. *Valencia–Lucena*, 925 F.2d at 512; *United States v. Geer*, 923 F.2d 892, 894 (1st Cir. 1991); *Benavente Gomez*, 921 F.2d at 380; *United States v. Santana*, 898 F.2d 821, 824 (1st Cir.1990). We will uphold a jury verdict of guilt if "*any* reasonable juror 'after viewing the evidence in the light most favorable to the prosecution ... could have found the essential elements beyond a reasonable doubt.'" *Valencia–Lucena*, 925 F.2d at 512 (emphasis in the original) (citations omitted).

"This court will not assess credibility of witnesses," *Valencia–Lucena*, 925 F.2d at 512, nor require "the government to disprove every reasonable hypothesis of innocence." *Serrano*, 870 F.2d at 5 (citation omitted). Rather, we will uphold a guilty verdict if the record as a whole supports a conclusion of guilty beyond a reasonable doubt. *United States v. Mount*, 896 F.2d

612, 615 (1st Cir.1990); *Serrano*, 870 F.2d at 5.

To sustain a guilty verdict on a conspiracy charge, the government must show both the existence of a conspiracy and the defendant's knowing and voluntary participation in it. *Benavente Gomez*, 921 F.2d at 380; *United States v. Sanchez*, 917 F.2d 607, 610. The government must prove two types of intent; the intent to agree and the intent to commit the substantive offense. *Rivera–Santiago*, 872 F.2d at 1079.

The defendant need not know the extent of the conspiracy. *Sanchez*, 917 F.2d at 610; *Walters*, 904 F.2d at 771. All that is necessary "is to show 'the essential nature of the plan and [his] connection with it.'" *Sanchez*, 917 F.2d at 610 (quoting *Rivera–Santiago*, 872 F.2d at 1079 (quoting *Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 256–57, 92 L.Ed. 154 (1947))). The government may show the existence of such a plan by either direct or circumstantial evidence. *Valencia–Lucena*, 925 F.2d at 512; *Rivera–Santiago*, 872 F.2d. at 1079. Further it is generally recognized that the agreement itself may be either tacit or express. *Sanchez*, 917 F.2d at 610; *Rivera–Santiago*, 872 F.2d at 1079.

After examining all the evidence against Perez Martinez in the light most favorable to the government, and drawing all reasonable inferences in the government's favor, we uphold the conviction. Perez Martinez testified that he and his wife had traveled to Puerto Rico to collect the proceeds of a real estate sale which would be paid by cashier check. While there, they had planned to visit his wife's relatives and attend a hair-styling show. He claimed that when he and Maritza Candelaria Pantoja met Agent Morales and Agent Amador, he thought he was meeting someone named "Lisandro," whom he had been told was the former owner of the real estate. Furthermore, Agent Morales testified that the Sierra brothers never mentioned Perez Martinez by name and that he did not have any information regarding whether the Sierra brothers knew Perez Martinez.

Other evidence at trial supported a different finding. A jury could have found beyond a reasonable doubt that Perez Martinez knew that the underlying purpose of the trip to Puerto Rico was not to pick up money for a real estate transaction but to knowingly act as the collection agent for a drug conspiracy. In the taped conversation between the agents, the defendant and Pantoja in Agent Morales' car, the defendant indicated knowledge of the password necessary to collect the money. Further, Agent Morales asked the defendant if he understood what the errand entailed. The defendant responded with the correct sum of money, $160,000.

Agent Morales then stated that he did not "want problems with those people over there, then until this is not done we cannot keep dealing ..." indicating that this was not one discrete transaction but rather one of several. The defendant then indicated his understanding. When asked if Libardo had sent him, the defendant responded that he himself was unsure but that Amparo, his connection in Miami, was the one who talked directly with them.

After Perez Martinez was arrested, a small black telephone book was found in his wife's purse. In it was written the password "Lisandro on behalf of Carmen" and the telephone number that Morales provided the Sierras in order to reach him. Also in the book was the number for "Soledad," an individual with whom Agent Morales had previously discussed "the errand for Carmen." Furthermore, though Perez Martinez had testified that he came to Puerto Rico primarily to visit his wife's family and for his wife to attend a hair-styling show, he admitted on cross-examination that he only spent a few minutes with his wife's relatives and there was no evidence that she actually attended the hair-styling show.

Despite Perez Martinez's explanation for the events leading up to his arrest, we find that the government's evidence was sufficient to prove beyond a reasonable doubt that the defendant participated in the conspiracy to import cocaine. He knew the password for identification purposes. He

knew the amount that he was supposed to collect. The evidence indicates that he knew about others in the conspiracy, including a woman in Miami who dealt with others in the conspiracy. He expressed his understanding when Morales referred to other dealings. Though he testified that he was picking up a check for a real estate transaction, he was not surprised to receive cash instead. His wife had the telephone numbers of other members of the conspiracy. We find sufficient evidence to uphold Perez Martinez's conviction.

### B. *Refusal to Grant a Continuance*

█ Perez Martinez next claims that the district court erroneously denied a continuance. On Friday afternoon, June 15, 1990, the defendant testified that he had arrived at the Dutch Inn Hotel near midnight on November 5, 1989. On cross-examination, he was shown a registration card from the hotel which indicated that he had arrived there at 5:42 p.m. Perez Martinez stated that the card was incorrect because he had worked that day in Miami until 7:00 p.m. before flying to Puerto Rico.

After he testified, the defendant requested a one-hour recess in order to obtain a witness from the Dutch Inn Hotel to testify that the time indicated on the registration card did not reflect the actual time of check-in because the time clock was not functioning properly. Counsel for the government informed the district court that the defendant had been in possession of the document for six months prior to trial. The court denied the recess, noting that there had been an early recess the previous day to enable the defense to prepare.

█ It is within the trial court's discretion to impose reasonable time limits on the presentation of evidence. *Borges v. Our Lady of Sea Corp.*, 935 F.2d 436, 442 (1st Cir.1991). On matters of continuances, "broad discretion must be granted trial courts ..." *Morris v. Slappy*, 461 U.S. 1, 11, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610

(1983), and only "unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay" constitutes an abuse of discretion. *United States v. Torres*, 793 F.2d 436, 440 (1st Cir.), *cert. denied*, 479 U.S. 889, 107 S.Ct. 287, 93 L.Ed.2d 262 (1986). Factors that may be relevant in deciding whether the trial court abused its discretion include: "(1) the amount of time available for preparation, (2) the likelihood of prejudice for the denial, (3) the defendant's role in shortening effective preparation time, (4) the degree of complexity of the case and (5) the availability of discovery from the prosecution." *United States v. Lussier*, 929 F.2d 25, 28 (1st Cir.1991) (citations omitted).

The trial court did not commit an abuse of discretion in denying the continuance. Defendant Perez Martinez had been in possession of the document six months. During that period he had ample time to obtain witnesses to prove the malfunction of the time clock at the hotel. Furthermore, though the district court denied the continuance, it adjourned for the weekend shortly after the denial. Defendant Perez Martinez had from that Friday afternoon until Monday morning to obtain a witness to testify about the clock. Perez Martinez was not prejudiced by the denial of the continuance, and we find no error.

### C. *The Evidentiary Exclusion*

█ On Monday morning, counsel for co-defendant Pantoja offered into evidence two documents: a Puerto Rico Telephone Company receipt and a letter from the Dutch Inn Hotel. The receipt was offered to show that on November 5, 1989, Pantoja called her brother in Puerto Rico from Miami; the letter was offered to show that the hotel time clock had not been functioning properly in November of 1989. The government objected to the admission of these documents on the ground that the defendant had not complied with the reciprocal discovery requirement of Federal Rule of Criminal Procedure 16(b)(1)(A).[10]

---

**10.** Fed.R.Crim.P. 16(b)(1)(A) provides: "[T]he defendant shall permit the government to inspect and copy or photograph ... papers, doc-uments, ... *which are within the possession, custody or control of the defendant....*" (Emphasis added).

The court, finding that the defendant had violated its duty to turn over evidence to the government, excluded the evidence under Federal Rule of Criminal Procedure 16(d)(2).[11] The court refused to allow these documents into evidence, noting that the defense could have produced this evidence earlier to buttress its account of the events of November 5 and that the government should not be required to investigate the authenticity of the documents at such a late stage.

■■■■■ It is within the trial court's discretion to exclude evidence for non-compliance with 16(b)(1)(A). *See United States v. Hathaway*, 534 F.2d 386, 402 (1st Cir.) ("[t]he court has discretion in the handling of alleged noncompliance with discovery orders"), *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976), *and cert. denied, sub nom. Baptista v. United States*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976). *See also United States v. Caudill*, 915 F.2d 294, 299 (7th Cir.1990); *United States v. Sanchez*, 912 F.2d 18, 21 (2d Cir.1990). Such exclusions will only be reviewed for an abuse of discretion. *Hathaway*, 534 F.2d at 402; *Caudill*, 915 F.2d at 299; *Sanchez*, 912 F.2d at 299. Moreover, even if the trial court abused its discretion in excluding such evidence, it is not reversible error absent prejudice to the defendant. *Hathaway*, 534 F.2d at 402; *see also Caudill*, 915 F.2d at 299; *Sanchez*, 912 F.2d at 21; *United States v. Turner*, 871 F.2d 1574, 1580 (11th Cir.), *cert. denied*, 493 U.S. 997, 110 S.Ct. 552, 107 L.Ed.2d 548 (1989).

■■■ In the present case, the defendant has not shown such prejudice. Even if the records were improperly excluded under Federal Rule of Criminal Procedure 16(d)(2)

the defendant has not shown that the evidence would otherwise have been admissible. For the telephone record to have been admissible it would have had to have been authenticated under Federal Rule of Evidence 901 so that it would be admissible as a record of a regularly conducted activity under Federal Rule of Evidence 803(6). *See Belber v. Lipson*, 905 F.2d 549, 552 (1st Cir.1990) (authentication requires the custodian of records or other qualified witness). The defendant did not produce any witness from the telephone company to authenticate the telephone record as one kept in the regular course of business.

As to the letter, it was hearsay not within any exception under Federal Rule of Evidence 802. Both records were properly excluded under the rules of evidence.[12]

## C. *Sentencing*

Lastly, the defendant claims that the district court erred in sentencing him. The district court awarded Perez Martinez a two-level downward adjustment to his offense level, based on its finding under U.S.S.G. section 3B1.2 that Perez was a "minor" participant in the conspiracy. Perez Martinez, insists, however, that he was entitled to a four point reduction in his base offense level because of his "minimal" role in the drug offense.

■■■ In guidelines appeals, we review the district court's application of role-in-the-offense adjustments under a "clearly erroneous" standard. *United States v. Osorio*, 929 F.2d 753, 764 (1st Cir.1991); *Valencia–Lucena*, 925 F.2d at 514; *United States v. Wright*, 873 F.2d 437, 444 (1st Cir.1989). "And where more than one reasonable inference may be drawn from undisputed facts, the court's choice from

---

**11.** Fed.R.Crim.P. 16(d)(2) provides: "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may ... prohibit the party from introducing evidence not disclosed...."

**12.** Possibly the district court improperly excluded the two documents under Fed.R.Crim.P. 16(d)(2). The district court read Fed.R.Crim.P. 16(b)(1)(A) as requiring a defendant to collect all the evidence he intends to use at trial, prior

to trial and to turn it over to the government. Reading Fed.R.Crim.P. 16(c) suggests, however, that a defendant need only notify the government of new evidence once it enters his possession. Defendant did so here. Having done so, the defendant meets his obligation to provide reciprocal discovery, and is therefore not deserving of sanction. Nevertheless, since the evidence was properly excluded under the Rules of Evidence, the impropriety in the exclusion under Fed.R.Crim.P. 16(d)(2) is moot.

among supportable alternatives cannot be clearly erroneous." *United States v. Rosado–Sierra*, 938 F.2d 1, 2 (1st Cir.1991) (per curiam) (citing *United States v. Trinidad De La Rosa*, 916 F.2d 27, 29 (1st Cir.1990)).

▬ We find no error in the court's determination that Perez Martinez was a "minor" rather than a "minimal" participant in the conspiracy. The two-level decrease for minor participation applies to "any participant who is less culpable than most other participants, but whose role could not be described as minimal," U.S.S.G. § 3B1.2, comment. (n. 3), whereas the "infrequently" used four-level decrease applies to "defendants who are plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2, comment. (nn. 1, 2). "Minimal" participation may be indicated by "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others...." *Id.*

At the sentencing hearing, the district court observed:

> The Defendant was not a supplier, nor directly involved in the distribution of the cocaine[ ]. Apparently, he assumed a risk in order to achieve monetary gains and his role was supportive in nature. Based on the amount of money involved that he was to collect, the purity of the cocaine and the amount of cocaine, it is the judgment of the Court that the Defendant Rafael Perez Martinez be thereby committed to the custody of the Bureau of Prisons for a term of 140 months.

This assessment of Perez Martinez' role in the offense is supported by the record.

Perez Martinez argues that he should have received a more lenient sentence than Pantoja, who was also classified as a "minor participant" for sentencing purposes. The defendant claims that he merely served as traveling companion to Pantoja, who was more culpable. We find this argument without merit. The jury clearly believed that the defendant attempted to collect the first installment payment on a twenty-six kilo delivery of cocaine. This act is quite unlike those of the "minimal" participant envisioned by the Guidelines. *See* U.S.S.G. § 3B1.2, comment. (n. 2) (downward adjustment for minimal participant applies, "for example, ... [to] a case where an individual was recruited as a courier for a single smuggling transaction involving a *small amount* of drugs") (emphasis added). Twenty-six kilos is clearly not the small amount of drugs contemplated in the guidelines. In the present case, the district court properly applied the sentencing guidelines. We affirm Perez Martinez' sentence.

### Summary

We affirm the conviction of Fabio Rodriguez Cortes. We affirm the conviction and sentence of Rafael Perez Martinez. We vacate the conviction of Eduardo Ocampo Hoyos and remand his case for a new trial.

WOLF, District Judge (concurring dubitante).

I concur in the judgment in this case, including the decision to order a new trial for the defendant Eduardo Ocampo Hoyos. I also concur generally in the court's thorough opinion. I write separately, however, to amplify one point relating to the admission of Ocampo Hoyos' Colombian identification card and to differ respectfully concerning the characterization of the prosecutor's closing argument concerning the card.

I agree that the district judge abused his discretion in admitting Ocampo Hoyos' Colombian identification card under Federal Rule of Evidence 403. I believe that the card was relevant because Ocampo Hoyos' possession of it might tend to prove he and Libardo Sierra were "friends," as Libardo Sierra claimed. Possession of the card, however, had little, if any, probative value concerning whether Ocampo Hoyos knew the criminal nature of the "errand" he was running for his friend—an issue critical to proving Ocampo Hoyos was a knowing and willful co-conspirator, rather than a mere messenger.

I agree with my colleagues that the district court's primary reason for giving the identification card significant weight in the

Rule 403 balancing process was an impermissible reason. The district court found that "a Colombian would be more willing to trust another Colombian than anybody else ..." This analysis relies on an ethnic stereotype involving an assumed propensity to commit drug crimes based on national origin.

I also agree with my colleagues that giving significant weight to an impermissible factor in the Rule 403 balancing process constitutes an abuse of discretion. *See United States v. Hastings*, 847 F.2d 920, 924 (1st Cir.), *cert. denied*, 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988) (a trial judge abuses his or her discretion if significant weight is given to an irrelevant or improper consideration); *see also Independent Oil & Chemical Workers v. Procter & Gamble Manufacturing Co.*, 864 F.2d 927, 929 (1st Cir.1988) (same). Finally, I agree that where, as here, the erroneous ruling does not constitute "harmless error," a new trial is required.

If the opinion regarding Ocampo Hoyos ended with this analysis, I would not write separately. However, the opinion goes on to indicate that while not "misconduct," the prosecutor's closing argument concerning the identification card was the type of "appeal to the jury to find the defendant guilty by reason of his national origin" which was condemned in *United States v. Doe*, 903 F.2d 16 (D.C.Cir.1990). I do not concur in this characterization of the closing argument.

In *Doe*, the court held that, "The line of demarcation is crossed ... when the argument shifts its emphasis from evidence to emotion." *Id.* at 25. In the instant case, the prosecutor did not bring to the jury's attention the district court's improper reasoning in admitting the identification card. Nor did the prosecutor make an emotional appeal based on the Ocampo Hoyos' Colombian connection. Rather, he addressed the evidence and argued a single, appropriate factual inference, stating: "This young man has ties with Colombia, from there you can reasonably infer why Libardo Sierra was calling him his friend." Thus, I do not believe the argument was improper under the reasoning of *Doe*. Rather, this case is closer to the admission of Jamaican passports which was affirmed in *United States v. Blackwood*, 913 F.2d 139, 143 (4th Cir.1990).

My view on the prosecutor's closing argument does not affect the disposition of Ocampo Hoyos' appeal. I have stated my view, however, because it may be of professional and personal importance to the prosecutor in this case, and to others similarly situated.